WICKES BROTHERS (A CORPORATION) v. THE SWIFT ELECTRIC LIGHT COMPANY (A CORPORATION).

*Contract of sale—Guaranty—Action to recover purchase price—Recoupment—Damages—Evidence.*

A manufacturer of steam-engines contracted with an electric light company to build and deliver upon its premises, for use in *new* works it was erecting, an engine of specified description, guaranteeing, among other things, that it should make a saving of 50 per cent. in the quantity of fuel used over that consumed by the engine then in use by the vendee, under the same conditions as to furnaces, heater, or condenser, and that the saving should be equal to that claimed for the Corliss engine. The contract was silent as to the *amount* of fuel (coal) consumed by the *old* engine, and also as to the *kind* of Corliss engine referred to. The vendee was not obliged to pay anything upon the purchase price (which was to be retained as security for the guaranty) until it had tried the engine to its *full* satisfaction, and found it to fulfill all the

requirements of the contract. The *old* engine, shafting, etc., were to be received as part payment, but their *use* was retained by the vendee until its *new* works were in successful operation. The engine was delivered under the contract, and set up, and the new works put in operation, and the vendee made cash payments upon the contract, and turned over to the vendor the old engine, shafting, etc., *after* which it refused to make *further* payments, for the reason that the engine did not conform to the guaranty; and in a suit by the vendor to recover the balance of the purchase price the vendee sought to recoup the damages sustained by *such* breach. The foregoing is a summary of the *main* facts of the case, and, in affirming a judgment in favor of the plaintiff, the Court held:

1. That the balance due upon the contract was recoverable under a common-count declaration in *assumpsit*, if the jury found that the contract had been *fully* performed; and if the engine had been accepted, kept, and used by the defendant, although not in *all* respects conforming to the contract, its *reasonable worth* might be *so* recovered, not exceeding the contract price, less any damage sustained by the defendant on account of plaintiff's breach of contract.

2. That evidence of conversations between the parties, *prior* to signing the contract, in which estimates were made of the amount of coal consumed by the *old* engine, was admissible, the contract being silent on that subject.

3. That it was *not* competent for the defendant to show the cost of making alterations in the *new* engine so as to save 50 per cent. of the coal consumed in *its* ordinary work, the issue being the cost of the necessary alterations to effect *such* a saving in the amount consumed by the *old* engine.

4. A witness cannot be shown to have qualified himself to testify as an *expert* by proof of his conversations with acknowledged experts about the subject-matter of the inquiry, it being the worst kind of hearsay testimony.

5. Reports of experts of tests made of the Corliss engine at expositions were rightly excluded, it not appearing or being claimed that such reports were alluded to, or in the contemplation of the parties, at the time the contract was entered into, or that it was made in reference to the statements or tests contained in said reports.

6. It was proper to show on the cross-examination of an expert witness who had made but three tests of the Corliss engine, but who testified to the *claims* made by manufacturers of engines and by engineers of the saving made by the Corliss, that *his* information in regard to said *claims* was derived from trade circulars issued by the manufacturers.

7. It was *not* competent for defendant to show that it had made a test of the capacity and economical qualities of boilers in use in *another* of its plants, similar in all respects to those used in connection with the old engine, and of the *new* boilers used with the *new* engine, and ·to compare such tests, with a view of showing the superiority of the *new* boilers over the ones used in connection with the *old* engine, and the consequent saving of fuel, so as to show that such saving was due to the *new boilers,* and not to the *new engine;* such testimony being too remote, uncertain, and problematical.

8. Proof of the cost of changing the *new* engine so as to secure the same saving of coal in its operation as that claimed for the Corliss engine was properly excluded, it being conceded that such changes could not be made, and retain the general details of the engine as specified in the contract.

9. The guaranty contained in the words, " and that the saving shall be equal to tHat claimed for the Corliss," contains a *latent* ambiguity, which it was proper to explain by parol testimony, as was done by proof of the claim made by the defendant when the contract was made that the Corliss would effect a saving of 50 per cent. in fuel over the *old* engine, and the court should have confined the inquiry on *this* branch of the case to *such* claim.

10. The clause in the contract giving the defendant the right to retain the purchase price as surety for the guaranty, and the provision for the application of the *old* engine. shafting, etc., as part payment thereof, with the right of the defendant to *use* the same until it was running its new works successfully, must be construed together, and it is clear that the defendant could avail itself of such *use,* if it desired, until *fully* satisfied with the trial of the *new* engine.

11. Notwithstanding its waiver of *this* right by paying part of the purchase price in money, and turning over the old engine, etc., as further part payment, the defendant had the right if, upon a full trial of the new engine, it did not fulfill the requirements of the guaranty, to decline to accept or pay for it, in which case it would be entitled to recover back what it had paid; or it could accept the new engine, treat the sale as complete, and recover of plaintiff all damages arising out of its non-fulfillment of the contract, the measure of which would be the difference between the *new* engine as it *was* and the value had it conformed to the specifications of the contract.

Error to Saginaw. (Gage J.) Argued April 26, 1888. Decided May 18, 1888.

*Assumpsit.* Defendant brings error. Affirmed. The facts are stated in the opinion.

*Hatch & Cooley,* for appellant, contended:

1. That Hubbard was shown to be a competent expert witness; citing *Sisson v. Railroad Co.,* 14 Mich. 497; *Railroad Co. v. Perkins,* 17 Id. 301; *Peter v. Thickstun,* 51 Id. 589, 593.
2. The measure of defendant's damages was the difference between the value of the engine as received and as contracted for, at the place and for the purpose contemplated; citing 2 Suth. Dam. 425; *Converse v. Burrows,* 2 Minn. 229; *Melby v. Osborne,* 33 Id. 492; *Allen v. McKibbin,* 5 Mich. 449; *Martus v. Houck,* 39 Id. 431.
3. The payment of the purchase price was conditional upon the performance of the contract to the full satisfaction of the defendant, and this must be shown by a preponderance of testimony to warrant a recovery; citing *Gibson v. Cranage,* 39 Mich. 49; *Brown v. Foster,* 113 Mass. 136; *McCarren v. McNulty,* 7 Gray, 139; *Tyler v. Ames,* 6 Lans. 280; *Machine Co. v. Smith,* 50 Mich. 565.
4. The brief discusses the case fully, making the points stated in the opinion, but without further citation of authorities.

*John J. Wheeler (Benton Hanchett,* of counsel), for plaintiff, contended:

1. For the rule stated in head-note 1; citing *Allen v. McKibbin,* 5 Mich. 449; *Wilson v. Wager,* 26 Id. 463, 464; *Fuller v. Rice,* 52 Id. 436, 437.
2. Under the facts in this case, the right of defendant to refuse payment of the purchase price provided for in the contract may be tried; citing *Clark v. Rice,* 46 Mich. 308; *Machine Co. v. Smith,* 50 Id. 569, 570; *Daggett v. Johnson,* 49 Vt. 345; *Ventilator Co. v. Railroad Co.,* 66 Wis. 218; *Boiler Co. v. Garden,* 101 N. Y. 387.
3. Where there is but one reasonable conclusion to be drawn from the facts, it is the right and duty of the court to state it; citing *Kelly v. Hendrie,* 26 Mich. 255; *Battershall v. Stephens,* 34 Id. 68; *Garigan v. Evans,* 45 Id. 597, 599; *Stearns v. Vincent,* 50 Id. 209, 219.
4. The presumption is that the facts stated in the charge are sustained by the evidence, since it is not all returned; citing *Cummins v. People,* 42 Mich. 142; *People v. Cline,* 44 Id. 290.
5. The brief discusses the case on all of the points stated in the opinion, but without further citation of authorities.

CHAMPLIN, J. The declaration is upon the common counts in *assumpsit*. The plea is the general issue, with notice of set-off and recoupment.

The notice of recoupment sets forth that the causes of action mentioned and set forth in plaintiff's declaration arose upon and under a certain contract executed between the parties on July 18, 1885, which is set out in the notice, and the material parts of which are as follows:

"That, for consideration hereinafter mentioned, said party of the first part hereby and herein bargains and agrees with said party of the second part to build for said second party, and deliver on its premises, at the corner of Johnson and Water streets, in this city, on or before October 20, 1885, one horizontal steam-engine of the following description: Said engine as a whole, and in all its parts, to be of the best material, workmanship, and finish, a first-class machine in all respects; the cylinder to be 24-inch bore by 48-inch stroke; the frame of new design similar to the Corliss; adjustable cut-off, so as to render it capable of being adjusted by the hand of the engineer while the engine is in motion, to get the most economical use of steam through expansion, according to the varying work it may be required to perform, without the complication in valve-gearing; hammered wrought-iron shaft, 12 inches in diameter, and of suitab'e length for two bearings outside of main pillow blocks; sectional fly-wheel, 16 feet in diameter, weight 14 tons, fitted up with the greatest accuracy and most secure manner, and perfectly balanced in order to give the most uniform and steady motion; two driving pulleys, 14 feet diameter and 26-inch face, with cast-iron frames and wooden rims, balanced and fitted up in the most substantial and durable manner; all bearings of ample dimensions and strength; all rods and pins of hammered steel and bearings of phosphor bronze, steam-packing, piston, and all parts of the most modern design and perfect construction; Judson latest improved governor, with throttle and all latest improved oil-cups, cylinder cocks, and trimmings; all bolts, keys, and key-seats perfectly fitted; all wrenches, foundation bolts, anchor plates, etc.,—covering complete engine ready to set up.

"Said first party further agrees to furnish, when desired, said second party, free of all charge, all necessary foundation drawings, and such directions and personal attention as

will enable said second party to prepare foundation and erect and start said engine.

" Said party of the first part hereby and herein guarantees the construction of said engine in accordance with the foregoing description, and its perfect adjustability to the work it is required to perform, uniform and steady motion under varying loads, and that it will make a saving of 50 per cent. in the quantity of fuel used over that consumed by the use of the engine now run by said second party, under the same conditions as to furnaces, heater, or condenser, and that the saving shall be equal to that claimed for the Corliss

" As a surety for the foregoing guaranty, said first party agrees to leave the full purchase price of the engine in the hands of said second party until said engine has been tried to the full satisfaction of said second party, and found to fulfill all the requirements of this agreement. Said first party further agrees to furnish on premises hereinbefore mentioned, and on or before the 1st day of October, 1885, the following work, complete and ready to put up, including all bolts except bolts to attach to wood, keys, key-seats, and babbitted journals; all to be of first-class materials and workmanship, coupled and keyed as follows."

Then follows a description of the shafting, pulleys, and hangers, not material to be mentioned, and the contract continues as follows:

" In consideration of the foregoing having been fully and faithfully performed to the full satisfaction of the second party, then and in that case said second party agrees to pay · first party thirty-eight hundred and thirty-two and 80-100 dollars ($3,832.80), and surrender to said first party the following, now owned and in use by said second party, and to be continued in such use until said second party shall be successfully running its new works, viz.:

" One horizontal 20x30 in. engine, including shaft, fly-wheel, two driving pulleys, oil-cups, governor, wrenches, and bolts.

" One pulley, 48x24 in., 24 ft. 3¼ in. shafting.

" One pulley, 48x21 in., 7½ ft. 4 in. shafting.

" One pulley, 52x17 in., 20 ft. 4 in. shafting.

" One pulley, 31x6 in., 7 ft. 4 in. shafting.

" One pulley, 52x12 in., 9 ft. 4½ in. shafting.

" Eleven angle boxes, 1 pair couplings attached.

" One hanging box."

The notice then proceeds to deny the performance of every material clause in the contract, and claims damage to the amount of $20,000.

On the trial, the plaintiff, a corporation, claimed to have fully performed the contract, and was therefore entitled to recover under the common counts. It also appeared that part of plaintiff's claim was for goods sold and delivered to defendant outside of the contract.

The defendant was a corporation, and had been engaged in operating an electric light plant in the city of East Saginaw, in which it used two engines, one larger than the other, which were furnished with steam by a battery of three boilers, in connection with which a heater was used, which raised the temperature of the water before entering the boilers to 180 degrees. At the time the contract was entered into, defendant contemplated the erection of a new plant upon another location in the city of East Saginaw, to be used in place of its old one, expecting, also, to enlarge its business, requiring a much larger engine to do the work. With this object in view, it entered into negotiations with several parties engaged in the business of furnishing steam-engines, and, among others, with the plaintiff, who is an engine builder at East Saginaw, Mich. The result was the execution of the contract above set forth.

It was a disputed fact upon the trial whether, at the time the contract was entered into, anything was said or intimation given of any intention of defendant to put in new or different boilers in place of the ones referred to in the contract.

The plaintiff went on and built and put in upon defendant's premises at the place named an engine of the description specified in the contract. It was put in place in January, 1886, and was in operation in February of that year. On February 9, 1886, defendant sent a dispatch to plaintiff from Cincinnati, as follows:

" *Wickes Brothers:* You can move engine whenever you get ready. No objection here.      H. L. BRINTNALL."

Brintnall was secretary of the defendant. Plaintiff accordingly removed the old engine and other property mentioned in the contract. The defendant continued to use the engine in its business from February on during the year 1886, making some verbal complaints from time to time that the engine was not effecting the saving in fuel that was guaranteed, but without rejecting the engine, or declining to consider the contract as one of sale, until August 24, 1886, when the following correspondence ensued between the parties:

"EAST SAGINAW, MICH., August 24, 1886.
"MESSRS. WICKES BROS.,
       "East Saginaw, Mich.:
  " As we have frequently informed the officers of your corporation, the engine made by you for us under the contract bearing date the 18th day of July, 1885, does not work to our satisfaction, and we are not satisfied therewith. The engine does not effect the saving of fuel guaranteed in the contract. It is not provided with an adjustable cut-off, so as to render it capable of being adjusted by the engineer while the engine is in motion, and so as to get the most economical use of steam through exhaustion, according to the varying work it is required to perform. It does not give a steady uniform motion under varying loads, and in many other respects the engine does not fulfill the requirements of the agreement under which it was made. For these reasons we surely decline to make any further payments upon the contract, in so much as our damages exceed the whole amount of what remains unpaid.
       "Yours truly,
             "THE SWIFT ELECTRIC LIGHT CO.,
                   "By H. L. Brintnall, Sec'y."

"EAST SAGINAW, MICH., August 28, 1886.
"THE SWIFT ELECTRIC LIGHT CO.,
                   "City.
  " *Gentlemen:* Your favor of the 24th inst., signed by H. L. Brintnall, Sec'y, stating that the engine referred to does not work to your satisfaction, and you are dissatisfied therewith, and specifying several particulars in which you think

it does not comply with the terms of the contract, is received.

"As you have been operating it for some seven months, and less than one-fourth of that time would enable you to find out the defects named, it strikes us that the letter is a very singular one. If you mean that you intend to keep the engine and not pay for it, we must be permitted to dissent from such a proposition. We have made you just the engine we agreed to. We want either the engine or our pay for it, and must insist on one or the other.

" We do not care to enter into any controversy, nor do we want any lawsuit; and to avoid this last alternative, not waiving any of our rights or claims, and not conceding that you have any such as your letter mentions, we will say that you may either return us the engine, or pay us for it, if done within ten days from this date. If this offer is not complied with within the ten days, the matter is to stand as if no offer was made. We would rather have the engine than the money. We do not, and cannot, admit your right to reject the engine at this time, but we make above offer to end the matter.

"Yours truly,
"WICKES BROS.,
"By H. T. Wickes, Sec."

"EAST SAGINAW, MICH., Aug. 30, 1886
"MESSRS. WICKES BROS.,
"East Saginaw, Mich. :

"Yours of the 28th, signed by H. T. Wickes, Sec., is received.

"By our letter of the 24th we did intend to say that we do not propose to pay anything more upon the contract of July 18, 1885, and supposed that we made our views in that respect entirely plain. You now offer to us the privilege of returning the engine, or paying for it within ten days from the date of your letter. You are already fully informed that we decline to pay for it. The other alternative, of returning the engine within the time mentioned, you well know to be impossible, for the reason that, while it might be that we could remove this engine from our works within ten days, still we could not put another in its place, and the result would be, therefore, that our business would have to stop, and we sustain great damage.

" Again, your firm is entirely indefinite, because you do not inform us what disposition is to be made of the property which you received from us, viz., the old engine, shafting,

pulleys, etc, amounting in all to upwards of $2,000.00. Are you, under this offer, to re. n all that property? In such case, then, if we return the engine which we received from you, the result of our dealings would be simply this: You get both engines, and we are left without power to operate our works. This proposition is not to be entertained for a moment.

"In your letter you say, 'We have made you just the engine we agreed to.' This, as you very well know, is entirely incorrect, as we sta'ed to you in our letter of the 24th, and for many other reasons which may be mentioned. As we are so wide apart in our views as to our respective rights, it has occurred to the writer that perhaps the best way would be to submit the whole controversy to arbitration, to experts who are competent to investigate the matter as it should be, and come to a just conclusion.

"The writer has not at present the authority to bind the electric light company to an arbitration, but, if you look with favor upon this suggestion, he will endeavor to secure such authority from the directors, as he is willing to do almost anything within reason to avoid a law suit.

"Yours truly,
"THE SWIFT ELECTRIC LIGHT CO.,
"By H. L. Brintnall, Sec."

"EAST SAGINAW, MICH., September 4, 1886.
'SWIFT ELECTRIC LIGHT CO.,
"East Saginaw, Mich.

"*Gentlemen :* The offer to arbitrate, it seems to be Mr. Brintnall's personal opinion only. We understand you to be entirely satisfied with everything sold and furnished by us to you except the engine; and that as to the engine you do not think it does the work we agreed it should do. If this is the substance of the question between us, it will perhaps be less trouble and expense to arbitrate than incur the delays that seem to exist in the courts. We will therefore say that if we can agree upon the terms of arbitration and the arbitrators, and your company authorizes some one to represent it in making an arrangement, we are disposed to arbitrate and save the delays of the court. Awaiting your reply, we are
"Yours truly,            WICKES BROS."

"EAST SAGINAW, MICH., Sept. 7, 1886.
"MESSRS. WICKES BROS.,
"East Saginaw, Mich.:
"After giving the subject further consideration, Mr. Hub-

bard wishes me to say that we do not feel at liberty to decide for arbitration in Mr. Swift's absence, he being now in Europe.                    Yours truly,

"H. L. BRINTNALL, Sec'y."

Plaintiff gave evidence tending to show the following facts:

That, when the contract of July 18, 1885, was made, defendant was using in its old works a small engine with a cylinder 16x20 inches, and an engine with a cylinder 20x30 inches; that, anticipating a contract to light Saginaw City, and an increase in the lights in East Saginaw, defendant was building new works, and wanted a larger engine in which the smaller engine was to be put to operate with the new one; that the 20x30 engine to be taken out was about 200 horse-power, and the new one was about 400 horse-power; that plaintiff did not understand that new boilers were to be put into the new works; that the engine and machinery furnished under the contract were well made, and complied in all particulars with the specifications of the contract; that a part of the machinery in the contract was furnished in the fall, prior to November 20, 1885; and the engine was furnished, set up, ready to run, and commenced running, in February, 1886, and been used in the business steadily ever since.

That, November 20, 1885, when less than $200 was due on open account, defendant paid plaintiff $1,000 on material furnished under the contract, and, after the engine and machinery were set up and in use, the old 20x30 engine and machinery were delivered by defendant to plaintiff.

That the old engine continued to be used in the old works by defendant as before, to its full capacity, from the making of the contract in July, 1885, until the new works were completed, and the new engine put in to work; that no measurement of or test of the economy of the old engine was ever made; that no comparison or tests between the two engines were ever made, except as appears in Brintnall's testimony in the bill of exceptions; nor did plaintiff have an oppor-

tunity to make such comparison except the tests by cards.

That the cards show the economy of an engine; that the new engine saved 50 per cent. in fuel over the old engine; that the work that the new engine was expected to do was largely in excess of that done by the old engine.

That some time after the making of the contract, defendant decided to and did put into the new works new boilers; that the new works were in a new building at some distance from the old works,—had a brick chimney, the old had an iron smoke-stack; and the conditions in which the old engine worked differed from those under which the new engine worked; that with the old boilers a heater, and with the new engine and boilers a condenser, was used; that the shafting of the new works was larger and more in quantity; that there was difference in the length of the steam-pipe,—longer in the new works; that a steam-pump is run by the new engine, not used in the old; that a Corliss engine has the automatic cut-off; that the cut-off of this engine was such that the engineer could adjust the cut-off while engine is running; that the object of the cut-off is to so cut off the steam entering the cylinder, and use the expansion of the steam, as to use the smallest quantity of live steam necessary to do the work; that this point of cut-off depends on the steam pressure, and amount of work to be done, and economy of fuel depended on the judgment and attention of the engineer in properly adjusting and properly changing the cut-off; that the economy of an engine depends largely on its being run to its capacity, and should be tested on this basis; that defendant never lighted Saginaw, or materially increased the lights in East Saginaw, as contemplated, and this engine was never tested on this basis.

That the old engine has never been tested by card; nor has a test of it by weight of water and coal ever been made, except as referred to in Brintnall's testimony.

That the claim made for the Corliss engine at the making

of the contract was that it would make a saving of 50 per cent. over the old engine; that the engine furnished would make the saving guaranteed in that place and in that work; that in May, 1886, defendant had tests made by card that the engine was working as economically as a Corliss engine; that defendant's vice-president, in being talked to about the cards, said that he did not care anything about the cards; that it was the coal pile he was looking after.

That the work to be done by this engine (running dynamos) is steady, and, where the load is to be increased or decreased by adding or taking off dynamos, the engineer can, and should, change the cut-off.

That 60 days was sufficient time to try and test the engine.

Under the declaration, and the evidence introduced by plaintiff, it was proper for it to introduce testimony of the value of the engine. If the jury should find, under the testimony introduced, that plaintiff had fully performed the contract on its part, the plaintiff would be entitled to recover the balance due it under the common counts in *assumpsit*, not exceeding, however, the contract price; or if the jury should find that the engine was not in all respects in accordance with the contract, and the defendant had accepted the engine, and kept and used it, the plaintiff would be entitled to recover under the common counts what it was reasonably worth, not exceeding the contract price, less any damage the defendant would be entitled to on account of plaintiff's breach of contract. The errors assigned upon the admission of such testimony are overruled.

The question asked Lysander Hubbard, the vice-president of defendant, whether, before the signing of the contract, there was any talk between him and either of the Messrs. Wickes respecting the amount of coal consumed by the old engine was wrongly excluded. The court did so on the ground that no conversation was necessary to explain the provisions relative to the amount of coal consumed. The

defendant was permitted to, and did, introduce testimony to show this conversation by Mr. Brintnall, and also to show the amount of coal consumed in a year by the old engine, as shown by the coal-bills paid by the defendant. The defendant was not, therefore, prejudiced by the ruling.

This witness was also asked:

" How much would it cost to make the alterations in this engine so as to save 50 per cent. of the fuel that this engine consumes to do its ordinary work?"

The question was objected to on the ground that it was immaterial, and that the witness had not shown himself competent to speak upon the subject. The court sustained the objection. The ruling was right upon both grounds. The issue was not what the cost of making alterations so as to make 50 per cent. saving in the fuel consumed to run *this* engine, but to make this engine so it would save 50 per cent. of the fuel which was consumed in running the old engine under like conditions that the old one was run ; and certainly nothing had appeared in testimony to show that the witness was qualified to express an opinion. Efforts were afterwards made to show that he had qualified himself to testify as an expert by talking with machinists and mechanics about it, and was then asked the same question again, and was not permitted to answer. This was not error. Such testimony would not be that of an expert, but would be the worst kind of hearsay.

Harold L. Brintnall, the secretary and treasurer of defendant, testified that, at the time of making the contract, he told Messrs. Wickes Bros., in the presence of Mr. Hubbard, that they were consuming about 1,400 tons per year in their plant with both engines, and that 50 per cent. would be a saving of about 700 tons per year. He also testified that for a period of 10 months the defendant had weighed the coal used in running both of the engines in the new plant, which included that furnished by the plaintiff, and the smaller of

the two engines used in the old plant, and that in 10 months they had used 666 tons; that during this time the work which was required was about the same as that required when they consumed 1,400 tons in a year in running the two engines in the old plant. If the quantity burned during the 10 months was a fair average, then by adding one-sixth to that quantity the amount consumed in a year would be obtained, namely, 777 tons, which would be a saving of about 50 per cent. of that consumed by the old plant. There was no evidence that the coal used during the 10 months was of the same quality, or in like condition, as that used when the total consumption was 1,400 tons, and it cannot be considered as an exact test of the saving afforded by the new engine. The result certainly did not justify Mr. Brintnall in claiming to the plaintiff, as he testifies he did, that the engine was saving nothing.

Card tests had been made several times previous to August 24 by mechanical experts showing the efficiency of the new engine as compared with the Corliss engine; and the plaintiff claimed that these tests were satisfactory, and demonstrated that the saving in fuel would equal 50 per cent., and was fully equal in that respect to the Corliss; while, on the other hand, the defendant claimed that these tests showed that this engine was not equal to the claims made for the Corliss in the saving of fuel. None of these tests were made under the conditions named in the contract; namely, as to furnaces, heater, or condenser, the same as that used with the old engine. This had become impossible by the act of the defendant. So that practically the only test that could be made was under that clause of the contract which guaranteed "that the saving shall be equal to that claimed for the Corliss." But this guaranty was made with reference to the claim of Allis & Co., manufacturers of the Reynolds-Corliss engine, that it would save 50 per cent. in fuel over the engine then in use by defendant, as will be seen further on.

It appeared from the testimony of several witnesses that there are many kinds of engines known as "Corliss Engines," manufactured by different parties. One witness testified that there were seven or eight varieties. It is a type of engine wherein the action of the steam in the cylinder is controlled by the load, through the action of a valve controlled by the governor. The engines made by different manufacturers known as the "Corliss Engine" do not all produce the same result exactly. It depends upon the different conditions under which they are used. Testimony was introduced of the results obtained from a Corliss engine which was competing for a prize at Cincinnati, and also of another used in a paper-mill at Hamilton. Mr. Holmes, a mechanical expert and engineer, produced a card taken from a test of the engine at Hamilton, which showed a result of 18.08 pounds of steam per hour per horse-power. He also testified that it is claimed, among mechanical engineers and engine builders, for the Corliss engine, the fair average consumption of steam is 18 or 19 pounds of water or steam per horse-power per hour, as accounted for by the indicator; and by tests made by him the Wickes engine showed 23.36. Other mechanical engineers produced by the plaintiff testified that the Wickes engine compared favorably with the Corliss, under the card test, and was fully as good or better than the average Corliss engine.

The defendant's counsel insisted that, under the contract between these parties, it was incumbent upon the plaintiff to prove that the Wickes engine was equal to the best Corliss engine made, or, rather, to the best claim made for the Corliss. We do not think this is the proper construction to be given to the contract, as will more fully appear from what is said below with reference to this clause of the contract.

Testimony was offered and excluded of the report of the expert on the test of automatic cut-off steam-engines at the first Millers' International Exposition at Cincinnati, in June,

1880, showing a summary of trials for engines, non-condensing, the Reynolds-Corliss and the Wheelock, as showing the steam expended, the economy of the engine, the coal economy, etc.; also the report of the board of commissioners of the Cincinnati Industrial Exposition held in 1875, in so far as it shows results of tests of the Corliss and Buckeye and automatic cut-off engines, for the purpose of showing the water per indicated horse power per hour, by tanks and by card indicator.

This testimony was rightly excluded. It was not shown, or proposed to be, that these reports were alluded to, or in the contemplation of the parties, at the time the contract was entered into, or that the contract was made in reference to the statements or tests therein contained. They were wholly irrelevant to the issue.

The offered evidence stands upon a different footing from that called out on the cross-examination of the witness Holmes. He testified as an expert. It appeared that he had made only three tests of the Corliss engine, but he testified to the claims made by manufacturers of engines and engineers of the saving made for the Corliss. On cross-examination, he was shown a trade circular of the manufacturers of the Reynolds-Corliss engine, and testified to having seen the same as the one shown him in different parts of the country; and was then asked if he did not find the claim made by them in that circular, that the steam indicated horse power per hour was 24.9, and he answered that was what it read. He stated he obtained his information in regard to the claims of the Reynolds-Corliss engine from that and similar circulars he might have seen, and for this reason the cross-examination was proper.

Testimony was offered showing that defendant had an electric light plant at Bay City, in which it used a battery of three boilers, similar in all respects to those used in the old plant at East Saginaw; and defendant offered to show that

it had made a test of the capacity and economical qualities of these boilers, and also of the new boilers at East Saginaw; and it sought to compare the Bay City boilers, as a substitute of the old boilers, with the new boilers, with a view of showing the superiority of the new boilers over the old, and the saving of fuel thereby, so as to show that the saving of fuel was due to the new boilers, and not to the new engine. The testimony was rightly excluded. It was too uncertain, remote, and problematical to form a basis for comparison. The fuel used was different, and there was a difference of location and construction, and numerous other elements which would go to affect the evaporating capacity of the boilers at the two places.

Inquiry was made by defendant's counsel, of experts, to ascertain what it would cost to change this engine so that, when it was operated, it would effect the same saving of coal as is claimed for the Corliss. This was objected to, and during the colloquy that ensued it was conceded that such change could not be made, and still retain the general details of the machine as specified; and thereupon the court sustained the objection. There was no error in this ruling.

Counsel then asked the witness Holmes this question:

"How much less is this machine worth than it would be if it would effect the saving of the Corliss engine?"

Objected to as not competent, and counsel for plaintiff stated the reason why it was incompetent was that the witness' testimony was all given on the basis of three examinations made by himself of Corliss engines, and that does not furnish a basis upon which the witness can estimate or base an estimate of the damage between the value of this engine and the value of what is claimed for the Corliss engine; that the evidence shows that there are a great many different kinds and classes and makes of Corliss engines. No one of the classes referred to is in the contract. The court then said:

"I understood the gentleman to say that he could not tell the comparative economy between the engines except through tests. Did I so understand you?"

The witness answered: "Absolutely, yes."

The following colloquy between court and counsel then ensued:

"*The Court.* Mr. Hanchett suggests that the question ought to refer to the average Corliss engine; that is, that the inquiry should be made in regard to the average engine, and in use under the same conditions that this engine was being used, the same character of work, as I understand it.

"*Mr. Hanchett.* Yes, sir.

"*The Court.* It occurs to me, to be plain about the matter, that to compare this engine working in the electric light works, and doing this work, with the exposition engine, for instance, where it is natural that everything would be placed under the most favorable circumstances to give the most satisfactory results possible,—at the same time the engineer and all others connected with it on the alert, in order to compete successfully with the other engine,—to compare that, and have that the rule of damages in this case, would certainly be more than the law would require. That is an extreme case on the one side, and an engine in actual use doing work on the other. If that would be the result of the question, it would seem to me to be improper. But if you take the average use of these engines in actual practice, and transacting business, as they are ordinarily run,—of course, by competent engineers,—it occurs to me we would arrive nearer what the parties intended by this contract than we would to make an extreme comparison of that kind. Your question, it seems to me, should only go so far as to compare this between the exposition engine and this one, as determined by the tests.

"*Mr. Draper.* If your honor will give us the benefit of your judgment in the other case,—of an engine running twenty-four hours a day right along, and a better test than the other.

"*The Court.* It would seem that the engine in the paper-mill was better; but it occurs to me the question ought to cover engines in use, doing actual work, similar to this character of work, and an average engine.

"*Mr. Hatch.* Your honor is understood to sustain the objection.

"*The Court.* In precisely the language used, yes. The rule is correct, I think. [Defendant excepted.]"

Counsel for defendant not did see fit to act upon the suggestion of the court, and we must determine whether he was entitled to have the question answered in the form in which it was put. The object of the inquiry was to prove the damages suffered by defendant. The rule of damages was the difference between the value of the machine as it was and what the value would have been if it had complied with the contract. The contract was that it would make a saving of 50 per cent. in the quantity of fuel used over that consumed by the use of the engine then run by defendant under the same conditions as to furnaces, heater, or condenser, and that the saving should be equal to that claimed for the Corliss.

In order to understand what the parties meant by this portion of the contract, it will be necessary to advert to the testimony of Mr. Brintnall, on the part of the defense, and of Mr. Harry T. Wickes, on the part of the plaintiff. Referring to a conversation with the plaintiff before the contract was drawn, Mr. Brintnall said:

"I told them that E. P. Allis & Co., of Milwaukee, would guarantee a saving of 50 per cent. in fuel with an engine that they would furnish us over that used by our old engine, and they (Wickes Bros.) said they would do the same thing.

" *Q.* Who said that?

"*A.* Harry Wickes.

" *Q.* Was there any reference to an offer to take pay out of what would be saved?

"*A.* Yes; I told them that also.

" *Q.* What did you say upon that subject?

" *A.* I told them that Allis said he would take his pay in the coal we would save in four years' time.

" *Q.* What did he say about that?

" *A.* He said they were willing to do the same thing. Allis & Co. made what is known as an 'Automatic Corliss engine,' —Reynolds-Corliss engine."

Harry T. Wickes testified:

" *Q.* Did you understand from the company or from Mr.

Brintnall, or did you know from outside, what claims were made for the Corliss engine ?

" *A.* Yes, sir.

" *Q.* What was that claim ?

" *A.* We understood they claimed a saving of 50 per cent. over the old engine.

" *The Court.* You mean over the engine they had been using in the works?

" *A.* Yes, sir; the engine we took from them."

Also Henry D. Wickes testified, without objection, as follows :

" *Q.* What did you understand, then, at the time this contract was signed, was the claim for the Corliss engine in the way of saving you guaranteed,—a saving of fuel equal to that claimed by the Corliss ?

" *A.* I was told, as coming from the parties themselves, they offered to make a gain of 50 per cent.

" *Q.* Was that what you understood when you made this contract?

" *A.* Not a gain over every engine, but over the present one.

" *Q.* Over the old engine used by the electric light company?

" *A.* Yes; in their old plant."

Here we have the testimony of both parties that, immediately before the contract was entered into, the claim made for the Corliss engine was that it would effect a saving in fuel of 50 per cent. over the old engine. Viewing this contract from the stand-point of the parties when it was made, the construction to be given to this clause is plain, and the court should have confined the inquiry to what the parties then understood and agreed upon, namely, that the claim made for the Corliss was that it would effect a saving in fuel of 50 per cent. over that consumed by the use of the old engine. The question was properly overruled, not only for the reason that it was not confined to the saving *claimed* for the Corliss engine, but because it was not confined to the claim made for the Corliss over the old engine.

The guaranty contained in the words, "and that the saving shall be equal to that claimed for the Corliss," contains a latent ambiguity. Claimed by whom? By the inventor? By manufacturers of this class of engines? Or by some particular manufacturer who offers to furnish an engine to defendant? The contract is silent to whom and when the claim was made. It is proper to explain such latent ambiguity by parol testimony, and the testimony referred to does fully explain it. It is true, the circuit judge held the plaintiff to a more rigid line of proof upon this portion of the contract, and also in his instructions to the jury; but his errors in this direction were not prejudicial to the defendant, and it cannot complain.

The circuit judge charged the jury that,—

"In determining whether this engine does comply with the contract in making a saving equal to that claimed for the Corliss engine, the jury are not to compare this engine with the very best Corliss engine, nor the very poorest, nor with the claim made for the best nor the poorest Corliss engines; they are to compare it with such an engine as would fairly represent a class of engines known as the 'Corliss.' If you find it makes a saving equal to that claimed for such an engine, it would be sufficient to comply with the contract; that is, the engine would be a fair representative of the class of engines known as the 'Corliss.' * * * It is what the Corliss engine would save in doing the work in the situation this engine is. That, of course, is the position. It is the Corliss doing the same work this engine is required to perform. This engine was built for this special electric light works."

The court gave further instructions immediately following the above quotation, in which he said:

"If the jury do not find that the saving of this engine in doing the work it was constructed to do when properly handled is less than the saving claimed for the Corliss would be in doing the same work, then the plaintiff is entitled to recover the contract price, less the payment it has made."

The court also instructed the jury as follows:

"Under this contract, the plaintiff was bound to manufacture an engine capable of perfect adjustment to the work it should be required to perform, and of uniform steady motion under varying loads; an engine that would make a saving of 50 per cent. in the quantity of fuel over that consumed by the use of the old large engine then in use by the defendant, under the same conditions as to furnaces, heater, or condenser; and also to construct such an engine as would effect a saving equal to that claimed for the Corliss engine. The main question of fact in this case is, did it construct such an engine?

"According to the terms of this contract, the defendant had this opportunity: After the engine had been delivered to the defendant, it might have taken the engine and made a test of it, to ascertain whether it fulfilled the requirements of the contract, whether it was satisfactory to it; and if, upon that test it was honestly satisfied that it did not, it could have said to the plaintiff in this case, the Messrs. Wickes Bros.: 'This engine does not make the saving you agreed it would; it does not give uniform motion under varying loads. We don't wish your engine.' And, if its position was correct, it could have passed the engine back to the plaintiff, and there would have been no sale, under such circumstances, and no obligation for it to pay anything at all. But it did not take that course in this case. The engine was set up, and it continued to use it from early in January, 1886, until September 27, the time this suit was commenced.

"It is true, there is some testimony tending to show that it made complaint as early as May with regard to the engine; but the testimony also shows that it made a payment upon it prior to that time, surrendering voluntarily all the old machinery and the old engine. By that surrender it made a payment on this engine that is independent of any money payment that may have been proved here. This was a direct payment upon this engine, and that it so treated it is evidenced by its letter. It said, 'We will make no further payments on this engine,' thus showing that it had already made payment upon it when they made complaint, in August, I think. Its continued use of it for so long a period of time, not saying to the plaintiff, 'We don't want your engine at all,' but having made payments upon it, it is the view of the court that it treated it on its part as a sale, and those facts made a sale of the engine by the plaintiff to the defendant. That, however, does not release the plaintiff from the guaranty it has made; but it places it in this position: If the engine was not constructed according to the contract, and

the engine was accepted by the defendant, the plaintiff in the case would be entitled to recover what the engine was worth, not exceeding the contract price; and the defendant would be entitled to deduct from that sum such damage as it might have sustained because the engine was not constructed according to contract.

"The law provides a rule for that damage,—a definite rule, —and that rule is this: The defendant is entitled to have, in this case, deducted,—that is, it is entitled to recoup, as we say,—as damages, the difference between the value of the engine as constructed, and its value had it been constructed in accordance with the contract. It is that difference that is to be deducted; that is the rule. The inquiry must be as to the difference between what it is worth as it is in fact, as found by the jury, and what it would have been worth if built according to the contract; that is, if the jury find that it is not constructed in accordance with the contract."

Under the terms of the contract, the defendant was not obliged to pay anything upon the purchase price of the engine until it had tried the engine to its full satisfaction, and found it to fulfill all the requirements of the agreement. The old engine, shafting, etc., was to be received by plaintiff as part payment, but it was to be continued in the use of defendant until the defendant was running its new works successfully. These clauses must be construed together, and it is clear that defendant could hold the old engine, and use it, if it desired, until it was fully satisfied with the trial of the new engine, and found it to fulfill all the requirements of the agreement. Instead of doing so, it made payment in money, and surrendered the old engine to plaintiff. Notwithstanding this, it had a right, after a full trial, if it found it did not fulfill the requirements, to decline to accept it, or pay for it, in which case it would be entitled to recover back what had been paid; or it could accept the engine, treat the sale as complete, and hold the plaintiff responsible to it for all damages arising out of the non-fulfillment of the contract. The testimony shows that it pursued the latter course.

The law affecting its right to damages for a breach of the contract contained in the instructions of the court to the jury was as favorable to the defendant, under the facts of this case, as it was entitled to, and was substantially correct. If anything, the rule laid down as to the claims made for the Corliss was too favorable for the defendant, in not confining the claim to the Corliss over the old engine of defendant.

Several errors were assigned which we do not consider it necessary to comment upon. They have all been examined, and we are satisfied that they are not well taken.

The judgment is affirmed.

SHERWOOD, C. J., MORSE and LONG, JJ., concurred. CAMPBELL, J., did not sit.